All right, we'll call the next case United States v. Patricia Fountain. Good morning, Your Honors. Julie McGrain from the Federal Public Defender's Office on behalf of Defendant Patricia Fountain. I would like to reserve one minute for rebuttal, please. Yes. So the evidence in this case was insufficient. Are you doing rebuttal for all appellants? No, I'm not. We just have one rebuttal. Oh, just one rebuttal. You want to agree upon yourselves. You're now going to do three different rebuttals. Yes, then I will take care of rebuttal for the panel. You're in charge. Okay. So the evidence in this case was insufficient to convict Defendant Patricia Fountain for Hobbs Act extortion under color of official right. The Hobbs Act is intended, under color of official right, is intended to address a situation where a defendant is caught in public office promising to misuse his office once he receives payment. All that was established in this case is that Patricia Fountain worked for the IRS. There was never any indication that the payor, Deborah Alexander, who was charged in Count 10 of the Hobbs Act extortion case, had any belief that Patricia Fountain was going to use or misuse her office in order to effectuate the payment or the recall of this refund. Don't we have the testimony that the intermediary told the various people, Alexander not necessarily identified as one of them, about the consequences being red flagged by the IRS if there wasn't the $400 payment made? Yes, Your Honor. There was a lot of talk about this red flag proposition. But what Natasha Witherspoon actually testified is that she really had no idea what Fountain meant by red flagging. She used that terminology, and that was the question that the government asked. But what she said was she knew Fountain would do something if people didn't pay the fee. It would be a bad thing. But that's all she knew about it, and so that's all she could have ever communicated to Deborah Alexander or anyone else. So when we add that to the record that's before the jury, and just the fact of the timing of when the payment was made, which is when the application is still pending but hadn't yet been approved, why doesn't that answer the question whether no reasonable jury could find under these circumstances that there was a violation? Because what I think that the court below missed and why the evidence was insufficient is because we have to remember that this is not a regular Hobbs Act extortion case where there's some evidence of coercion. It's Hobbs Act extortion under color of official right. And color of official right replaces the element of coercion for purposes of these types of extortion cases. And so the essential element of coercion here under color of official right, the evidence was simply not sufficient to establish that. There's no evidence that, and in fact Deborah Alexander said that the fact that Patricia Fountain worked for the IRS had absolutely no bearing on her decision to pursue this refund. She trusted Natasha Witherspoon, and what Natasha Witherspoon was telling her, she wanted the money, she was greedy. That's what her testimony was. But then she says she paid the amount because she wanted to make sure she got a refund. She paid because she wanted to make sure she got the money, correct. But there was nothing to the effect of I paid the refund because I knew that Patricia Fountain had red flagged me with the IRS and was going to make sure that my refund would be recalled. That's not at all what was said because Natasha Witherspoon had no idea. This was never communicated, the fact that Patricia Fountain, the red flagging was actually filing an amended return, forged in Deborah Alexander's name saying that I'm not entitled to this refund. Well, whether she actually used her official position is not the issue, right? We're looking at what the belief was on the part of the payor, correct? It's under Mazzei and under Ben Savango, it is that the payor held the belief and that Fountain exploited that belief by the misuse of the office. There's no evidence that Alexander ever felt compelled to pay Patricia Fountain this money because she believed that Fountain was going to use her official office to somehow influence. Fountain was a customer service representative at the IRS. Yes, Deborah Alexander knew that Fountain worked for the IRS, but beyond that had absolutely no idea. And the idea that it's reasonable that a customer service representative would have some power over the end result of, yes, you get a refund or no, you don't get a refund, that evidence is not in the record. That was actually the sales pitch, wasn't it? I work for the IRS. I can get you this. I mean, that's what essentially lured the customers. No, Your Honor, that's not. That's wrong. That's what I think the government argued and the district court believed, but that's not what the evidence showed or what the standard is under Hobbs Act extortion under color of official right. Again, the central status element, as Judge Fischer referred to it in the Manzo case, the central status element acting under color of official right is what's missing in this case because what the government is essentially asking you to do is stretch the definition of under color of official right to cover any extortion that occurs simply because someone held public office. What about the government's argument that if the evidence was insufficient, she certainly was guilty of attempted extortion? No, Your Honor, also in Manzo, as to attempt, it fails for the same reason because, as Judge Fischer said, acting under color of official right is, again, the central status element of a claim and it must be established even in an attempt case. The attempt is to cause a transfer of property or the attempt to use the office. You still need to prove that those attempts were made in exchange for using official status, and that's what is absent here. If we look to the evidence that was present in Mazzei and in Bensavango, there was very clearly testimony from the payors in those cases saying, I knew what the office was, I knew what I was asking for, and I expected that the office of the mayor or the office of the state senator was going to make sure that what I was paying for came to me. That is absent in this case. Mr. Gray, thank you very much. Mr. Siegel? May it please the Court, my name is Dan Siegel and I represent the appellate Larry Ishmael. I'll be taking six minutes of argument. I'd like to briefly address the three issues identified in the Court's letter. First, do we apply the new standard for procedural error? Second, if we don't, what's the appropriate standard of review? And third, even if the district court made a mistake, is it really necessary to remand? I'd like to begin with a concession of fact that goes to the harmless error analysis. The government has argued that Larry Ishmael actually knew about the $1,500 cutoff for IRS fraud investigations, and in their opening brief at page 47, they cited to a parallel citation one to the Ishmael appendix at page 814. So I looked at page 814. I didn't find anything about $1,500, and in my reply brief I pointed that out. Apparently there was a typographical error in the government's brief. They weren't referring to the Ishmael appendix at page 814. They were referring to the Ishmael appendix at page 738, and there the same witness testifies that Mr. Ishmael told him about the $1,500 limit for fraud investigations. So the question is, does that necessarily mean the government wins on the issue of harmless error? And my answer is, not necessarily. The reason is, because when you evaluate harmless error, you have to evaluate the whole record, which means for this particular witness, reviewing his direct testimony and his cross-examination. During the cross-examination, the defense attorneys challenged his credibility on several accounts, including the fact that he had lied to the investigating agents, he committed a new fraud after this conspiracy was over, and that years earlier, as an accountant, he had committed an earlier IRS fraud. So my argument to you would be this. It is not entirely clear that if this is the only witness who would have attributed the $1,500 knowledge to Mr. Ishmael, it's not entirely clear that Judge Dalzell would have credited him and credited this particular witness. And again, the standard for harmless error is, if it is highly probable, the error does not prejudice the defense. Mr. Siegel, since we're looking at the entire record, can we also take account of Judge Dalzell's statement at Johnson's sentencing? It's referenced at the government supplemental appendix at 74, where he said, the elaborateness, the protracted nature of the scheme, the hundreds of people involved in it, and the careful calculus of your client and the other co-defendants, Ishmael and Felton, leaves absolutely no doubt that as far as the facts are concerned, this is sophisticated means. I think we have to look at the rationale that was presented by Judge Dalzell when he ruled upon Mr. Ishmael's objection to the sophisticated means of enhancement. I thought your objection was a procedural one, that he hadn't made a finding as to your client and that this was a sort of vicarious imposition of the enhancement because of Felton. But doesn't that statement that he made at Johnson's sentencing reflect his findings, even as to your client? I would resist that, Your Honor, because at the Ishmael sentencing, he specifically said that this sophisticated means was made possible by Ms. Felton, not Mr. Ishmael. Now, why he said two different things at two different hearings, I can't say. All I can say is that at our hearing, he was pretty clearly relying on a theory of vicarious liability. And look, I'm not criticizing the judge for saying what he was thinking. We want judges to state the reasons for why they're making enhancements under the record. In fact, Judge Fischer said something that was relevant to this in the Greer case, the M-Bank decision. He said this at page 572 of the Greer case, where Judge Fischer said, the rationale by which a district court reaches a final sentence is important. He indicated that it allows for effective appellate oversight. So, yes, we argued that this scheme wasn't particularly sophisticated, but the district court judge took it in a different direction. And with all due respect to the district court judge, when you do that, you have to apply the right legal standards. He then objected to the sophisticated means enhancement at the time of sentencing under Flores-Mejia. Is that correct? He objected. Under Flores-Mejia? He objected in his papers. There was an argument on it. Flores-Mejia isn't retroactively applicable because this particular hearing was before Flores-Mejia was decided. In footnote 7, Flores-Mejia says it's only applicable from here forward. So Flores-Mejia isn't retroactively applicable. So turning to the other point, then, if that rule isn't applicable, what is the standard of review for this case? In this case, there's a dispute between the parties. The government says that this issue was reviewed for clear error, and I must respectfully disagree. If the district court did not identify and apply the correct legal standard, that's not an issue of fact. That's an issue of law. And under the sentencing guidelines, an error of law is, by definition, an abuse of discretion. So that's the basic argument. Are there any other questions from the panel? It seems that his argument now is a little different from the one that was presented to the sentencing judge. And what he's now saying is that the sophisticated means was not foreseeable to him. Did he make an objection on that grounds? The argument is that the district court, though he dealt with our objection, dealt with it on a different theory. Foreseeability is conceding that there were sophisticated grounds. Sophisticated means were used, but they were not foreseeable to me. Well, the argument is that the district court didn't consider the issue of foreseeability, which is a legal error in not applying the standard. Now, on remand, maybe he'll find it was foreseeable. Maybe he won't find it was foreseeable. But it seems to me that to say it was not foreseeable is to concede that sophisticated means were used, but I did not foresee that they were being used. Oh, we concede that Ms. Fountain – I'm not trying to say Ms. Fountain – but we concede that the judge was right when he said that Ms. Fountain used sophisticated means by her use of the knowledge of the IRS. And the question – the problem is the judge said, not Mr. Ishmael. Now, if you say that it's not Mr. Ishmael, you have to state some reason for why you're holding him responsible for the other person's use of sophisticated means. That's the reasonable foreseeability test, and unfortunately, the judge didn't apply it. So that's the legal error that we're identifying in this case. If our standard is – if our standard is plain error and is – was it incorrect that – does the record show that Ms. Fountain's use of sophisticated means was foreseeable? I'm not so sure that we would win under a plain error standard. However – If we did. If – I'd like to just say why I think a plain error standard wouldn't apply. In – first of all, Flores-Mejia is not – Not under Flores-Mejia, but under the basis that you didn't raise it at sense. Oh, no, no, no. I think – I think the issue was preserved by Judge Garzell. If we – if we disagree with you. If we – if you disagree with me, then I don't think we can meet a plain error standard. Okay. That's my question. Thank you. Mr. Siegel, thank you very much. Mr. Bozzelli? Good morning, Your Honors. Lawrence Bozzelli on behalf of Calvin Johnson. I reserve three minutes of argument time. We've divvied that up. I believe the issue that is applicable to Mr. Johnson, and I believe that Mr. Siegel covered it as well, is whether or not the sophisticated means, first of all, was foreseeable to Calvin Johnson, and whether or not it was, in fact, sophisticated means. Now, Mr. Johnson was not an accountant. He did not work for the IRS. His role in this conspiracy was simply to go out on the street and get basic information from people, get their names, get their Social Security numbers and their addresses. We then provide that to William Martin, who was an accountant, as well as Mr. Ishmael Misfound, who then would do what they would do with it, and then he would get a small percentage of that. So the question that I presented and I objected to at sentencing was, was it foreseeable to him, to a man whose role simply is to provide this information? He didn't know the inner workings of the IRS. He didn't know more than provide information, and then was given a stipend as a result of that. The other question that I had is, is it, in fact, sophisticated means? Now, if you look at some of the actions that Mr. Johnson did, I would actually argue it was unsophisticated. He had multiple tax returns going into his own personal account, and that's one of the things that, of course, triggered a red flag to the investigators. So the argument being, how sophisticated is it if you have multiple people's tax returns going into your own account? It sounds like it's too dumb to be sophisticated. Exactly. I tried to make the argument to Judge Dalzell that it was unsophisticated means, and perhaps there's a departure there, but I didn't get the opportunity. And part of the other argument that I made, that I was trying to make to Judge Dalzell is, is that when you look at, and it's what Mr. Siegel said about a fair sentence, giving a sentence that's fair, obviously Mr. Johnson was attributed a very large portion of this loss amount, and part of the argument that I had raised in my appeal is whether or not that's fair. Again, you look at the actions of the conspiracy, and the actions, or the activity of the conspiracy, is not necessarily the breadth of the conspiracy. And one point in that is that Mr. Martin, William Martin, who was the accountant, who filed about 600 or so false tax returns, said that in that conspiracy, my client, Calvin Johnson, gave him about 35 names, which is about 5 or 6 percent, really, of the returns he filed. There weren't meetings. This wasn't the evil version of H&R Block. He just provided these names, but nonetheless, he was held accountable for the entire conspiracy. In fact, Mr. Martin even testified when I cross-examined him at trial. Was Mr. Johnson in this from the beginning? And he said, no, he came in later. He was a recruiter for me, but he came in much later. So part of the other argument I would ask this Court to consider is whether the loss amount that Judge Dalzell found attributable to Calvin Johnson, does that incorporate? Is it really what he did? And when you look at his limited actions, yes, he provided names that were later used as a result of this scheme, but I think that the judge kind of painted everyone in a very large brushstroke, as opposed to being specific as to what each person actually did. When you look at Collado and similar cases. Mr. Bozzelli, thank you very much. Mr. Cullen? Thank you, Your Honor. And it pleases the Court. Joseph Cullen on behalf of the United States. Your Honor, I would begin, if I could, with the issue of the sufficiency of the evidence raised by Patricia Fountain, in that she asked this Court to make a finding that the jury's verdict with respect to the extortion count was so irrational that even when you stack up the evidence and view it in the light most favorable to the prosecution, no rational fact finder could have found Fountain guilty. And the arguments made by Fountain simply are unavailing, because at the end of the day, Your Honors, Patricia Fountain was a public servant. She was a public official who caused the IRS to issue a refund to Deborah Alexander in exchange for money, $400 from Deborah Alexander. There are many other facts in this case that merit discussion, certainly with the issue of attempt, as the Court has raised. But at the end of the day, what makes this a very simple Hobbs Act extortion is the fact that Ms. Fountain worked for the IRS, that it was through her employment that she caused the IRS to act, and she did that for money. If that were what the government proved, that wouldn't meet the standard of knowing that the payment was made in return for official acts. Aren't we required to, I mean, what jury instructions and what we should be looking at is the reasonable belief on the part of the payor. Yes, and Judge Cross, that's what I was meaning to get at when I said in exchange for, that the reason for the action, the reason that she took the action was in exchange for, the reason that she took the action and the reason that the money was given to her was because of the official action. Which is the she you're referring to? I am sorry. The reason that Patricia Fountain caused the IRS to act and the reason that the victim, Deborah Alexander, gave the money, all of that was because of Ms. Fountain's employment with the IRS. And what Ms. Fountain does is she takes the evidence, she stacks it up, and she comes to a different conclusion that a jury could have made but did not make in this case. We look at the fact that Ms. Alexander knew when this scheme was proposed to her that Fountain worked with the IRS and could get the IRS to send her money. What's the conduct that the government is alleging constituted the extortion here? Is it some inference that Fountain was able to assist with getting the application granted? Or is it the red flagging, retribution if you don't make payment? Sure. I think at the most basic organization, her scheme with respect to Ms. Alexander, concerned the official action of the IRS issuing a refund check. That was an action that was made only possible through Ms. Fountain's position at the IRS. There was reference to Ms. Fountain being a customer representative. That actually was not what was presented to Deborah Alexander. What Deborah Alexander knew was that Ms. Fountain worked for the IRS. What the jury heard about what that meant and what her position meant was that by working for the IRS and working in that capacity, she was specifically instructed about specific information, official information, that she was entrusted to use responsibly. That information was provided not as something that was separate or immaterial to her job. That information was provided to assist the IRS in the fraud detection. She was responsible for using that information responsibly and certainly not illegally. In this case, the information was power. The information was what gave her the ability to execute the scheme. But exploiting inside information is different than exploiting someone's miserable belief that you can influence the decision. Sure. We need to focus on the latter. Sure. The question is, based on the fact that what was being pitched to her, Deborah Alexander, was that we have an IRS employee who can get the IRS to send you money for nothing. And then Ms. Alexander learns that there's a catch. You're going to have to give this IRS employee about a third of that money in order to keep that money. The question is, was it reasonable for Ms. Alexander to connect the dots, which are in fact the facts, that Ms. Fountain was in fact a public official, that she was abusing her office to cause the IRS to send that check out to Ms. Alexander. And what we would also obviously point out, too, under these facts, was that Ms. Fountain was prepared to have the IRS take additional action if her money was not paid to her. And that, in fact, is what happened and what ultimately Ms. Alexander did learn when the IRS demanded repayment from her when she did not pay the money quickly enough. It seems like on Alexander's direct examination, 316 to 318 of the appendix, that the government's trying very hard to get Alexander to say that she was submitting the claim and paying Fountain because of her position at the IRS, and the witness just wouldn't say that and eventually moved off that line of questioning. But what do we have on this record that shows that the payment was being made because of a belief that Fountain could or would influence the approval of the application? Right, and we can look at this from the perspective of a jury answering that question. Why would Fountain give this money, excuse me, why would Alvinner give this money to Alexander? Why would she give $400 to someone she didn't know very well? Why would she give $400 to someone unless the reason that Ms. Fountain, unless the reason was that Ms. Fountain was using her position in order to get her a refund, which is what she did. We can't say that it's because there's no other plausible inference. I mean, isn't it equally plausible that she used it as paying someone like an accountant or someone who was filling out the paperwork, who was making the submission. It was a fee for service to someone acting really in a private capacity of filling out and submitting that application. And that's a fatal problem for Patricia Fountain, which is that a jury could have made another interpretation of those same facts. And while many different interpretations are certainly plausible, there's nothing unreasonable, there's certainly nothing irrational about the jury looking at this evidence, looking at the timing and the manner in which what was communicated to Ms. Alexander was communicated to her. Look at the fact of what Ms. Fountain actually did. And I think it bears noting at this point, before I move on to the other issues this morning, unless the Court wants to hear from me more, is that, importantly, the Court did instruct the jury as to the issue of attempt. And so even if there was some breakdown or some question as to whether a complete extortion had been committed, undoubtedly Ms. Fountain took certainly at least one substantial step, if not more. That was charged as a lesser-included offense. Yes, Your Honor. And it's a general jury verdict. Yes, Your Honor. And if it were just attempt, that would be a different guideline, right? Not in this case, Your Honor, in regards to the guideline range. The guideline range was not affected by the extortion count. So Alexander knew that Fountain was working for the IRS, but from her perspective this was all perfectly legitimate. I'm sorry, say that again, Your Honor. It was perfectly legitimate. In other words, from Alexander's perspective. Not exactly, Your Honor. Ms. Alexander, and again, we are aware of the red flagging issue, that the IRS would red flag. Her exact words when asked was whether she remembered anything specific being told her. She said no, she did not. The testimony of Natasha Witherspoon was that Fountain clearly said red flag, and Ms. Alexander later learned what that meant when Ms. Alexander was red flagged when the payment was demanded. But to Your Honor's original question about what Ms. Alexander thought, if this was on the up and up or legitimate, what Ms. Alexander did say was that she thought this was suspicious when she learned how much she was going to have to kick back to Ms. Fountain, the IRS employee. Okay, but this is after she agreed to go through with processing. This is after she agreed, but before she actually had to pay the money. And obviously we could not, if we're talking about a completed offense, the offense could not be complete until Fountain actually obtained the money. And so at that point certainly Ms. Alexander formed a belief that this was at a minimum suspicious, that she had to give this much money to the public official in order to get the IRS to issue a check to her. Can we go back to the attempt for one second? Because I thought that the Hobbs Act sentence really drove this very long sentence. You're saying the guideline and the 2X1.1 reduction on attempt wouldn't make a difference? It would not, Your Honor. I believe we made note of that in a footnote in the summary of the facts in the earlier part of our brief. If you did, I missed it. That's okay. But the Hobbs Act account itself did not. There were obviously in the court, I believe as the PSR, there were many things that made this case so egregious that drove the guidelines, among them the loss amount, which was extraordinary with respect to Ms. Fountain. Things like her abuse of trust, which would not be affected by the conviction of the Hobbs Act, which was a two-point enhancement. Her leadership role, which was substantial. The fact that the identifications of third parties were being used unauthorized, and other enhancements as well. Those all added up to a figure so high that under the grouping rules, this conviction did not in any way impact the sentencing guidelines. Speaking of sentencing, supposing we agree with Mr. Siegel regarding Ishmael. Would that affect the sentence in any way? I'm sorry, Court. Would Ishmael's sentence be affected if we were to agree with Mr. Siegel? It's a two-point enhancement for sophisticated means. If the court were to grant the relief being sought by Mr. Siegel and Mr. Ishmael and his client, the relief would actually be a remand for the court to make a finding, again, as sophisticated means, and for Mr. Ishmael to make the arguments that he never made before the district court, that the use of sophisticated means was not foreseeable. Now, of course, if the district court were to come to a different conclusion for the first time in this case involving any of the defendants concerning the use of sophisticated means, then, yes, Your Honor, Mr. Ishmael's guideline range would be different. And to that point, I'll speak to whatever aspects of this argument the court wishes me to focus on. I could begin with the issue of standard of review, as the court asked us in its outline to the parties. That's fine. Would it be plain error, as Judge Fischer suggested? It is plain error, Your Honor. And we would respectfully submit that really Flores Mejia doesn't have any bearing on the facts of this particular case, and we agree that Sevilla would be the controlling law at the time that this case was adjudicated. But Sevilla still required the parties to make their argument, and what changed after Sevilla was the fact that parties didn't have to remake their arguments, and to the extent that those cases would have applied in issues concerning sentencing guideline calculations as opposed to the manner in which the court was considering 3553A factors, it simply does not apply. And what we have here is an argument that simply no one ever thought was important to raise at the district court level, and it's notable, Your Honors, because if we look not only at the sentencing hearing itself, which I think the court can glean from the comments that are made at the end of a long journey, with the court incorporating and referencing prior sentencing and the line that he actually used was an amazing record that had been developed in the case, it's clear in that case that prior to the hearing itself, in the sentencing memorandum, there's about 10 pages concerning reasonable foreseeability raised by Mr. Ishmael, but not on the issue of sophisticated means. That had everything to do with the issue of loss, and when that issue was flagged for the court, the court, as it did with the other defendants, made sure that the government produced all the evidence that defendants could possibly want to see, would actually meet with the defense, and then conducted a protracted hearing on that very issue. At no point during that hearing, at no point prior to that hearing, and at no point in the written submissions of Mr. Ishmael, did Mr. Ishmael make any suggestion that the sophisticated means that were used in this case were not foreseeable to him. In fact, Your Honors, I would submit it's nearly implausible to imagine a scenario in which Mr. Ishmael did not know about the sophisticated means because, first of all, the trial record made that clear, and with respect to my colleague, there's not a typographical error in our brief on page 47. There's actually two sites. The first site refers to Ms. Fountain's brief, her appendix, and that's 648 of her appendix, and that actually references the conversation that was discussed today, in which Mr. Fountain was told explicitly, Mr. Fountain, excuse me, told another witness, William Martin, explicitly about the fact that he knew about this $1,500 threshold, that Patricia Fountain told him about it, he understood the importance of it, and that alone was the basis, the court found that alone could be a basis for reporting the enhancement. But the court threw out the totality of its comments, not just this one aside it made about stressing, as it repeatedly did, that he did not think Mr. Ishmael was anywhere near as culpable as Ms. Fountain, who received a much more severe sentence. The court repeatedly emphasized the hands-on, in fact, leadership role that Mr. Ishmael played in the scheme, and it's hard to imagine not only that he didn't know about the sophisticated means, it's impossible almost to imagine that the use of sophisticated means were not foreseeable to him. We can look even beyond the telephone access tax refund scheme that the court mentioned by way of example. We can look at the first-time homebuyer scheme, where after perhaps recognizing that some of the earlier tactics had been risky, flagging people using the Internet from their actual home, the plan became a bit more sophisticated, and all of a sudden multiple bank accounts, which were all provided to Mr. Ishmael, were being used. All of a sudden the claims that were being provided to Mr. Ishmael were being filed via Internet protocol addresses, external to the Fountain Home through third parties that could not be traced back to Mr. Ishmael. So for those reasons, because of the complexity of the scheme that involved, just with respect to Mr. Ishmael alone, roughly $2 million of loss and hundreds of hundreds of claims, which the court made an explicit finding, the court I think notably summed up towards the end, that but for Mr. Ishmael's leadership in this highly complex scheme or set of schemes, this would have involved just a handful of claims. And it was only because of Mr. Ishmael that the loss of the government was so profound and the criminal involvement of so many people occurred in this case. And for those reasons You didn't make findings as to reasonable foreseeability in imposing the enhancement. That's right. And we would stress that he was never asked to and he was never put on notice that this was an issue. And again, in light of the trial record, which he clearly cited and accredited, and I would note, and I realize my time is up, if I can just make one final observation, there was no contrary evidence submitted. That is, that whatever credibility tacks are now being made about William Martin for the first time today on appeal, someone who the court wishes to look at how the judge considered Mr. Martin could look at his sentencing. But if we were just to look at what the trial record was, there was no witness to say something different. There was no one who got up and said, look, Mr. Ishmael was involved in this scheme, but he had no idea that the IRS employee was doing these things. In fact, in a case where he's essentially the husband of Ms. Fountain, the employee making this all possible, it really defies belief that that could have happened. Part of the scheme was filing amended returns for those who did not pay. Was Fountain the only one who was filing the amended returns? Was Ishmael involved? Well, that's actually the reason I pointed out. The two sites that we provided on page 47, the second site was not a typo. It was a reference to the fact that Ishmael was at least aware that that was going on, that he did not necessarily approve of that tactic because it seemed a bit wisty. But his essential role was a recruiter for him. He had many roles, Your Honor. One of them was being a recruiter and also supervising other recruiters, but he also filed many of the returns. There were records that showed that while Fountain was at work, some of these returns where the information was provided to him were being filed from his house. He was also involved in collecting the business bank accounts from people and directing other people in this conspiracy.  Thank you, Your Honors. Mr. Kahn, thank you very much. Ms. McGrain. Yes, Your Honors. First, I'd like to address the fact that the government seems to be conflating belief and the reasonableness of that belief. Under Mazzei and Benzevango, those are two separate inquiries, and it doesn't matter what we believe Alexander knew or should have known. It's about what she said in the record she knew, and that was that Patricia Fountain's position at the IRS had absolutely no bearing. Natasha Witherspoon thought this was a legitimate avenue for getting this refund. She believed Patricia Fountain would never do anything to jeopardize her job. There was plenty of talk about this being Obama money or stimulus money in the neighborhood  I'm sorry. Did she actually make an affirmative statement in her testimony that your client's position at the IRS had nothing to do with her making the payment? She did not make that statement, Your Honor, but as you pointed out, she did not say in response to the government's question, so was it Patricia Fountain's position at the IRS, did that have any influence? Her answer was clearly no. And she said her total influence was that she felt that Natasha Witherspoon would not steer her wrong, and Natasha Witherspoon thought this was a legitimate enterprise, and that's what she communicated to her. The other thing that I would like to point out is that there would be an impact on Ms. Fountain's sentence if the court were to reverse on the Hobbs Act conviction. The Hobbs Act conviction carried a 20-year statutory maximum. Ms. Fountain's guidelines were 188 to 235. The court imposed a sentence of 228 months on the Hobbs Act conviction and then imposed a statutory maximum on all the other counts of conviction to run concurrently to the Hobbs Act sentence. So if this were vacated, we would absolutely need to go back for resentencing, and the only way to achieve a guideline sentence would be for the court to stack the statutory maximums for the offenses of conviction consecutively, and that goes to the reasonableness of Ms. Fountain's sentence. Lastly, I would just like to say we do not concede that there were not sophisticated means involved, and the court would not have to reach the issue of standard of review if it reversed on the sophisticated means enhancement. Thank you. Thank you very much, and thanks to all counsel for your arguments.